UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

Eastern District of Kentucky
FILED

JAN 4   2006

AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CIVIL ACTION NO. 04-602-GWU

JUDY COMBS,                                          PLAINTIFF,

VS.                        **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,              DEFENDANT.

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative

denial of her applications for Disability Insurance Benefits (DIB) and Supplemental

Security Income (SSI). The appeal is currently before the Court on cross-motions

for summary judgment.

## APPLICABLE LAW

The Sixth Circuit Court of Appeals has set out the steps applicable to judicial

review of Social Security disability benefit cases:

1.    Is the claimant currently engaged in substantial gainful activity? If yes, the claimant is not disabled. If no, proceed to Step 2. See 20 C.F.R. 404.1520(b), 416.920(b).

2.    Does the claimant have any medically determinable physical or mental impairment(s)? If yes, proceed to Step 3. If no, the claimant is not disabled. See 20 C.F.R. 404.1508, 416.908.

3.    Does the claimant have any severe impairment(s)--i.e., any impairment(s) significantly limiting the claimant's physical or mental ability to do basic work activities? If yes, proceed to

1

Combs

Step 4. If no, the claimant is not disabled. <u>See</u> 20 C.F.R. 404.1520(c), 404.1521, 416.920(c), 461.921.

4.   Can the claimant's severe impairment(s) be expected to result in death or last for a continuous period of at least 12 months? If yes, proceed to Step 5. If no, the claimant is not disabled. <u>See</u> 20 C.F.R. 404.920(d), 416.920(d).

5.   Does the claimant have any impairment or combination of impairments meeting or equaling in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments)? If yes, the claimant is disabled. If no, proceed to Step 6.   <u>See</u> 20 C.F.R. 404.1520(d), 404.1526(a), 416.920(d), 416.926(a).

6.   Can the claimant, despite his impairment(s), considering his residual functional capacity and the physical and mental demands of the work he has done in the past, still perform this kind of past relevant work? If yes, the claimant was not disabled.   If no, proceed to Step 7.   <u>See</u> 20 C.F.R. 404.1520(e), 416.920(e).

7.   Can the claimant, despite his impairment(s), considering his residual functional capacity, age, education, and past work experience, do other work--i.e., any other substantial gainful activity which exists in the national economy? If yes, the claimant is not disabled.   <u>See</u> 20 C.F.R. 404.1505(a), 404.1520(f)(1), 416.905(a), 416.920(f)(1).

<u>Garner v. Heckler</u>, 745 F.2d 383, 387 (6th Cir. 1984).

Applying this analysis, it must be remembered that the principles pertinent to the judicial review of administrative agency action apply.   Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. <u>Jones v. Secretary of Health and Human Services</u>, 945 F.2d 1365, 1368-1369 (6th Cir. 1991).   This "substantial

2

Combs

evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. <u>Garner</u>, 745 F.2d at 387.

One of the detracting factors in the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim. <u>Bowie v. Secretary</u>, 679 F.2d 654, 656 (6th Cir. 1982). This presumes, of course, that the treating physician's opinion is based on objective medical findings. <u>Cf. Houston v. Secretary of Health and Human Services</u>, 736 F.2d 365, 367 (6th Cir. 1984); <u>King v. Heckler</u>, 742 F.2d 968, 973 (6th Cir. 1984). Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. <u>Hardaway v. Secretary</u>, 823 F.2d 922 (6th Cir. 1987). These have long been well-settled principles within the Circuit. <u>Jones</u>, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain. Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms. 20 C.F.R. Section 404.1529 (1991). However, in evaluating a claimant's allegations of disabling pain:

3

Combs

> First, we examine whether there is objective medical evidence of an
> underlying medical condition.  If there is, we then examine:  (1)
> whether objective medical evidence confirms the severity of the alleged
> pain arising from the condition; or (2) whether the objectively
> established medical condition is of such a severity that it can
> reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment.  The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability.  Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984).  However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the Court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987).  Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford

4

Combs

or obtain treatment to remedy his condition, <u>McKnight v. Sullivan</u>, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step six refers to the ability to return to one's past relevant category of work. <u>Studaway v. Secretary</u>, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a <u>prima facie</u> case by proving that he or she is unable to return to work. <u>Cf. Lashley v. Secretary of Health and Human Services</u>, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 C.F.R. 416.965(a) and 20 C.F.R. 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. <u>Id</u>. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. <u>E.g., Faucher v. Secretary of Health and Human Services</u>, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

5

Combs

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 C.F.R. 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 C.F.R. 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d

6

Combs

279, 282 (6th Cir. 1985).    Even then, substantial evidence to support the

Commissioner's decision may be produced through reliance on this expert testimony

only if the hypothetical question given to the expert accurately portrays the plaintiff's

physical and mental impairments.    Varley v. Secretary of Health and Human

Services, 820 F.2d 777 (6th Cir. 1987).

### DISCUSSION

The plaintiff, Judy Combs, was found by an Administrative Law Judge (ALJ)

to have "severe" impairments consisting of dysmotility, mild gastroparesis,[1] mild

chronic obstructive pulmonary disease, undifferentiated connective tissue disease,

exostosis of the foot (resolved), gastroesophageal reflux disease (controlled with

medication), and a history of cholecystectomy, hysterectomy, Nissen fundoplication,[2]

mild to moderate generalized anxiety disorder, and an affective disorder. (Tr. 26).

Nevertheless, based in part on the testimony of a vocational expert (VE), the ALJ

determined that the plaintiff retained the residual functional capacity to perform a

significant number of jobs existing in the economy and, therefore, was not entitled

---

[1]Gastroparesis is defined as paralysis of the stomach. Dorland's Illustrated
Medical Dictionary (27th Ed.), p. 682.

[2]Mobilization of the lower end of the esophagus and plication of the fundus of the
stomach around it (fundic wrapping), in the treatment of reflux esophagitis that may be
associated with various disorders, such as hiatal hernia.    Dorland's Illustrated Medical
Dictionary (27th Ed.), pp. 667, 1138.

Combs

to benefits. (Tr. 37-40). The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ had asked the VE whether a person of the plaintiff's age of 42 years, high school education, and semiskilled work experience could perform any jobs if she were limited to light level exertion, and also had the following non-exertional impairments. (Tr. 68). She: (1) could not climb ladders, ropes, or scaffolds; (2) could perform occasional handling and fingering with the right hand; and (3) had no more than a "limited but satisfactory" ability to relate to co-workers, interact with supervisors, deal with work stresses, and understand, remember, and carry out complex instructions. (Id.). The VE responded that there were jobs that such a person could perform, and proceeded to give the numbers in which they existed in the regional and national economies. (Tr. 68-9).

On appeal, this Court must determine whether the hypothetical factors selected by the ALJ are supported by substantial evidence, and that they fairly depict the plaintiff's condition.

The plaintiff alleged disability with onset date of December 23, 2001 due to a wide variety of problems including hepatitis, rheumatic fever, a mental breakdown, a hysterectomy, gallbladder problems, a hiatal hernia, carpal tunnel syndrome, stomach failure, and bone spurs. (Tr. 142).

A voluminous number of medical records were submitted, many of which predated the alleged onset date by a considerable period, including gallbladder

8

Combs

surgery in 1999, a laparoscopic anti-reflux procedure and Nissen fundoplication in February, 2000 for "intractable" gastroesophageal reflux disease, a colonoscopy in July, 2000 for complaints of persistent diarrhea and lower abdominal cramps, which was essentially normal, although a small polyp was removed. (E.g., Tr. 205, 322). She was also evaluated for complaints of swelling and pain in the small joints of the right hand, but a rheumatologist, Dr. Jaya Pampati, found only minimal swelling in some of the digits of both hands, with the right being more prominent than the left. (Tr. 373). There was no evidence of acute or active synovitis in other joints, and he found only mild tenderness and spasms in the lumbosacral spine. (Tr. 374). The physician diagnosed osteoarthritis, with no clinical evidence of acute or active inflammatory arthritis, concluded that no further workup was necessary unless the patient developed new symptoms, and suggested that she try Tylenol. (Tr. 374-5).

Records were also submitted of an admission to the Ridge Behavioral Health System for six days in January, 2001, approximately 11 months before the alleged onset date, for a history of depression and suicidal preoccupation, which she associated with having multiple surgeries (including gallstones, a hiatal hernia, a hysterectomy), and a strained relationship with her husband. (Tr. 323). She was admitted with a diagnosis of depression, and given a Global Assessment of Functioning (GAF) score of 30. (Tr. 325). A GAF score of 30 reflects an inability to function in almost all areas as per the Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition-Text Revision) (DSM-IV-(Tr.), p. 34. However, she was

9

discharged with a GAF of 60, after showing some improvement in the hospital and showing no difficulty tolerating Zoloft. (Tr. 325). Her prognosis was considered to be favorable with counseling, and it was noted that she had an ability to work. (Tr. 327). The plaintiff testified at the administrative hearing that she had stopped counseling because she felt better, and her nerve medications would work "at times." (Tr. 55-6).

The plaintiff stated that she had been forced to stop working as a data entry operator following a December, 2001 motor vehicle accident which had left her with a broken right wrist. (Tr. 52-3). She was seen at the office of one of her family physicians, Dr. William Becknell, by a registered family practice nurse, Edna Stewart, who inspected emergency room records showing that no fractures were evident on three views of the right wrist, but there was a possible fracture on one other x-ray view. (Tr. 349). A referral was made to an orthopedist, Dr. Ronald Dubin, who reportedly felt that she only had a mild sprain and advised her to wear a splint and rest the wrist. (Tr. 348). He felt that it would not keep her from working, but did state that she had some carpal tunnel syndrome and recommended a nerve conduction study. (Id.). Another orthopedist, Dr. Harry Lockstadt, examined the plaintiff, and felt that she did have a small fracture of the right wrist, but it was in good alignment and should heal spontaneously. (Tr. 390). He obtained an EMG/NCV, which was normal. (Tr. 386-8, 709-10). Because of a positive bone scan, however, he recommended that she stay in a splint for the next three to four weeks. The patient

10

Combs

was also complaining of foot pain, and he eventually performed a procedure to remedy exostosis and a "kissing callosity," which had "healed up nicely" by April 22. (Tr. 382, 512, 702).  At that time, there was a barely perceptible tenderness in the area of the wrist fracture, and her range of motion had returned.  (Tr. 382).  He felt that she should be off work only for another week, pending the opinion of a rheumatologist.

A state agency physician reviewed the record in May, 2002, and concluded that the plaintiff essentially had no "severe" impairment.  (Tr. 436).

The plaintiff was also being seen by Dr. Lena Edwards, a specialist in internal medicine, with complaints of pain and stiffness in all of her joints, although Dr. Edwards found no significant joint effusions or synovial thickening on examination. (Tr. 419).   Blood work showed an elevated antinuclear antibody test, but all remaining blood work was negative.   (Tr. 418). She referred the patient to a rheumatologist, Dr. Gary Margolies (Id.), who also noted a normal examination, including grip strength, except for 10 of 18 characteristic tender points, although he added: "but these are mild" (Tr. 394-6).  There was a slight alignment deformity of the long fingers of both hands, but no overt soft tissue swelling.  (Tr. 394).  He suggested that she stayed off keyboarding activities until she was re-evaluated, and did not prescribe any medications.  (Id.).  On further examination in June, 2002, he found very minimal hints of erythema and tenderness in both hands, and some ankle tenderness without soft tissue swelling.  (Tr. 393).  He speculated that the patient

11

might have an incomplete connective tissue disease "either seronegative RA or possible SLE." (Id.). More tests were obtained, and these were normal except for mild hypoglycemia. (Tr. 392, 400). Meanwhile, Dr. Edwards had obtained x-rays which showed no evidence of destructive or erosive processes, and there were no neurological abnormalities. (Tr. 410-11). Dr. Margolies conducted an additional examination in August, 2002, which showed "no characteristic tender points," no appreciable soft tissue swelling even in areas indicated by the patient, and only mild tenderness in the joints of the hands and wrists. (Tr. 534). His assessment was of undifferentiated connective tissue disease with some features of polyarthritis "even though there are not a lot of objective findings.". (Id.). No functional restrictions are suggested.

Other physician visits in the period following the motor vehicle accident included a return to Dr. Edwin Nighbert, the gastroenterologist who had performed the anti-reflux procedure, due to complaints of abdominal pain. (Tr. 507). Dr. Nighbert noted that following the procedure the plaintiff had had some "bizarre postoperative complaints," but was "basically doing pretty well." Immediately following the motor vehicle accident, she had had a negative CT scan of the abdomen (Tr. 487), and the physician opined that there were no permanent problems (Tr. 507). Dr. Edwards obtained another CT scan of the chest, abdomen, and pelvis in September, 2002, which were essentially unremarkable, although another test did show an abnormally long gastric emptying time. (Tr. 581-3).

12

Combs

A state agency physician, Dr. John Rawlings, reviewed the record in August, 2002 and concluded that the plaintiff would have the residual functional capacity consistent with the ALJ's hypothetical question to the VE. (Tr. 437-5).

The plaintiff was also seen by another group of family physicians at Christian Cardiology with complaints of anxiety, and the physician, Dr. Muhammad Niazi, prescribed Xanax and an increase in Zoloft. (Tr. 525-6). Dr. Edwards, seeing the plaintiff in December, 2002, noted that she described "florid panic attacks," which continued despite an increase in Zoloft and Xanax from Dr. Niazi. (Tr. 552, 577). Dr. Edwards prescribed Effexor and clonazepam. (Id.). The only recent statement of mental functional capacity came from a consultative examination by Dr. Kevin Eggerman on May 13, 2002, at which the psychiatrist observed no depressive symptoms and only mild anxiety; the plaintiff said that Zoloft was helpful. (Tr. 377-80). Dr. Eggerman diagnosed mild to moderate generalized anxiety disorder and a depressive disorder, with a current GAF of 70 to 75 and 75 as the highest GAF for the past year. (Tr. 380). GAF scores in this range represent mild to slight symptoms. DSM-IV-TR., p. 34. He felt that she would have a "fair" ability to understand and remember complex instructions, relate to coworkers and supervisors, persist on tasks, and tolerate work-related stress. (Tr. 381).

Another a rheumatologist, Dr. Manoj Kohli, conducted more workups in early 2003, although part of his records are apparently missing from the court transcripts. However, it is apparent that his assessment was undifferentiated connective tissue

13

Combs

disease "characterized by synovitis, Raynaud's phenomena, a positive ANA, a negative ENA, negative rheumatoid factor, and negative anti-SCL antibodies," bilateral carpal tunnel syndrome, and tobacco abuse. (Tr. 592). He planned to obtain more tests, and sent the plaintiff to an occupational therapist for a wrist splint and range of motion exercises; he also increased the medication Plaquenil which had been prescribed by Dr. Margolies. (Id.). On the plaintiff's next visit, February 3, 2003, she reported her joint pains had decreased and described no morning stiffness. (Tr. 591). Dr. Kohli's examination was normal except for mild synovitis of the right second, third, and left second PIP joints, and he noted a "very good" range of motion in all joints. Laboratory data including bloodwork was reported as normal, and x-rays of the hands were reported to show only a "very slight" bowing of the MCP joints of the middle finger on the right hand. (Id.).

Dr. William Becknell, a family physician, submitted a residual functional capacity questionnaire dated August 8, 2003, which indicated that the plaintiff was unable to sit for more than 20 minutes at a time, unable to stand for more than five minutes at a time, could both sit and stand/walk less than two hours in an eight-hour day, could not lift even 10 pounds, could not use her hands or fingers to grasp or perform fine manipulations, and was unable to stoop or crouch. (Tr. 530-3). As far as her psychological condition was concerned, he indicated that her attention concentration would "often" be interfered with by pain "or other symptoms," and that she was incapable of even "low stress" jobs. (Tr. 530). As justification for these

14

restrictions, Dr. Becknell indicated that he had treated the plaintiff for "35 years for various things" including endometriosis, pain in the right wrist, carpal tunnel syndrome, gallbladder disease, a hysterectomy, and depression. (Tr. 529). Her symptoms included fatigue, weakness, irritable bowel syndrome, "connective tissue syndrome," and reflux. Asked to describe her pain, Dr. Becknell indicated that the plaintiff had pain in the right wrist, "can't hold a job," slept poorly, and was depressed. (Id.). He also circled "yes" after the question "Is your patient a malingerer?" (Tr. 529).

The ALJ rejected Dr. Becknell's opinion on the grounds that it was overly restrictive, unsupported by medical records, and described the patient as a malingerer. (Tr. 26, 30). The ALJ accepted Dr. Rawlings' earlier assessment. (Tr. 35).

The plaintiff maintains on appeal that Dr. Becknell's opinion as a treating source was not given sufficient weight, noting reasonably that his indication of malingering was most probably in error given the remainder of the assessment. The plaintiff also asserts that the lack of recent treatment notes by Dr. Becknell, with the most recent clearly dated note being August 11, 1999 (Tr. 364), although there are some undated and somewhat cryptic notes that could be more recent (Tr. 693-6), should not be a bar to the acceptance of his opinion since Nurse Stewart was seeing the plaintiff regularly and Dr. Becknell's office was clearly coordinating many of the referrals to specialists. Even assuming this to be the case, the opinion of even a

15

Combs

treating source is not entitled to controlling weight unless it is based on adequate signs, symptoms and laboratory findings. It is difficult to discern any findings in the treatment notes of the specialists that would support the extreme limitations on lifting, standing and walking given by Dr. Becknell, or to support his contention that she could not stoop or bend. His reference to carpal tunnel syndrome is not borne out by Dr. Lockstadt's testing, and his citation of gallbladder disease, while it was a problem before the alleged onset date, was apparently resolved in 1999. (Tr. 205, 253-4). Regarding the suspected connective tissue disease, all of the actual examinations were remarked for the paucity of physical findings, with Dr. Margolies finding no positive tender points on his most recent examination, and Dr. Kohli merely finding mild synovitis of some of the finger joints, "no triggering," and a "very good" range of motion. (Tr. 591). A reasonable finder of fact, therefore, could have concluded that Dr. Becknell's opinion was not sufficiently supported by objective findings.

The decision will be affirmed.

This the _____ day of January, 2006.

G. WIX UNTHANK
SENIOR JUDGE

16